**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANNETTE WHITE, | : | |
| | : | CIVIL ACTION |
| Plaintiff,[1] | : | |
| | : | |
| v. | : | |
| | : | |
| METROPOLITAN DIRECT PROPERTY | : | NO.    13-434 |
| AND CASUALTY INSURANCE CO., et al., | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER, S.J.                                                                July 29, 2014

Currently pending before the Court is the Motion for Summary Judgment of Defendant

Metropolitan Direct Property and Casualty Insurance Company ("Defendant").  For the

following reasons, Defendant's Motion is granted, and judgment on the entirety of Plaintiffs'

Complaint is entered in favor of Defendant.  Defendant's counterclaim for a declaratory

judgment is denied as moot.

## I.   FACTUAL HISTORY[2]

On or about March 5, 2011,[3] Annette White and Charles Williams ("Plaintiffs")'s

residence, located at 1715 North 59th Street in Philadelphia, Pennsylvania, sustained "severe

---

[1] As noted below, Plaintiff Charles Williams was later added as a plaintiff by stipulation filed in
state court on October 16, 2012, (Def.'s Mot. Summ. J., Ex. B), and is a plaintiff in this matter in
spite of not appearing in the case caption.

[2] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs. To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.

[3] Defendant's Motion for Summary Judgment references this date as March 4, 2011.  (Def.'s
Mot. Summ. J. ¶ 1.)

damage" due to what Plaintiffs initially claimed was "a sudden collapse that was the result of excessive rainfall."[4]  (Compl. ¶¶ 1, 4.)  Plaintiffs notified Defendant of the damage on March 8, 2011 and Defendant pursued an investigation of the claim.  (Id. ¶ 5; Def.'s Mot. Summ. J. ¶ 1.) Plaintiffs "expended monies to repair the subject premises, [and incurred] other costs as a result of being unable to live in the subject premises after the collapse."  (Compl. ¶ 8.)  Plaintiffs requested reimbursement from Defendant but have not received the amount requested.  (Id. ¶ 9.)

### A.  The Policy

Defendant issued Homeowner's Policy number 754527270 to Plaintiffs with a policy term of March 3, 2011 to March 3, 2012 (the "Policy").  (Def.'s Mot. Summ. J. ¶ 14.)  The Policy provides the following:

> CAUSES OF PROPERTY LOSS
> SECTION I – LOSSES WE COVER
> (SPECIAL PERILS)
> \*      \*      \*
> COVERAGE A – DWELLING AND COVERAGE B – PRIVATE STRUCTURES
> We will pay for sudden and accidental direct physical loss or damage to the property described in Coverages A and B, except as excluded in SECTION I – LOSSES WE DO NOT COVER.

(Id. ¶ 15.)

The Policy includes the following relevant exclusions:

> SECTION I – LOSSES WE DO NOT COVER
> 1. We do not insure under any Section I coverage for any loss which would not have happened in the absence of one or more of the following excluded events.
> (a) the cause of the excluded event;
> (b) other causes of the loss; or

---

[4] Plaintiffs subsequently denied this factual averment in their Complaint—that the collapse was a sudden collapse caused by excessive rainfall—by including a Response to Defendant's Statement of Material Facts in support of its Response to Defendant's Motion for Summary Judgment in which they state "Denied as stated.  Plaintiff's [sic] Complaint is a document that speaks for itself and any characterization by the Defendant thereof is specifically denied by Plaintiffs."  (Pl.'s Resp. to Def.'s Statement of Material Facts Supp. Mot. Summ. J. ¶ 18.)

(c) whether such causes acted at the same time or in any other sequence with the excluded event to produce or contribute to the loss.

These exclusions apply whether or not the excluded event results in widespread damage or affects a substantial area.  The excluded events are listed below.

\*        \*        \*

K.    Collapse, except as granted under SECTION I – ADDITIONAL COVERAGES for Collapse.

2.    We do not insure under any coverage for any loss consisting of one or more of the items below . . . .  Further, we do not insure for loss described in Exclusion 1. Above [including 1.K – Collapse] and Exclusion 3, below.

\*        \*        \*

A.    conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault;

B.    defective, inadequate, faulty or unsound:

1.    planning, zoning, development, surveying, siting;

2.    design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

3.    materials used in repair, construction, renovation or remodeling; or

4.    maintenance;

of any property whether on or off the residence premises.  Property included land, structures or improvements of any kind; and

C.    weather conditions.

However, this exclusion only applies if weather conditions contribute in any way with an excluded event or cause of loss to produce the loss.

3.    We do not cover loss or damage to the property described in Coverage A and Coverage B which results directly or indirectly from any of the following:

A.    wear and tear, marring, scratching, aging, deterioration, corrosion, rust, mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

\*        \*        \*

C.    settling, cracking, shrinking, bulging or expansion of . . . foundations, footings, supports, walls, floors, roofs or ceilings.

(Id. ¶ 16.)

3

The Policy further provides:

SECTION I – ADDITIONAL COVERAGES

\*        \*        \*

16.     Collapse.  We will pay for sudden and accidental direct physical loss to covered property involving the entire collapse of a building or any part of a building caused only by one or more of the following:

\*        \*        \*

    A.     perils described in Section I – Broad Named Perils;
    B.     hidden decay of the structure;
    C.     hidden insect or hidden vermin damage;
    D.     weight of contents, equipment, animals, or people;
    E.     weight of ice, snow, sleet or rain which collects on a roof; or
    F.     use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

(Id. ¶ 17.)

## B.  **The March 2011 Loss**

On March 4, 2011, the day after the Policy took effect, the City of Philadelphia Licenses and Inspections issued a Violation Notice to Plaintiffs, designating the premises as "unsafe," and stating that "[t]he indicated wall of the subject structure has loose and/or missing brickwork and is in danger of collapse."  (Id. ¶ 21; Def.'s Mot. Summ. J., Ex. I.)  On March 5, 2011, an exterior brick wall located at the rear of Plaintiffs' home collapsed, which Plaintiffs originally alleged was "a sudden collapse that was the result of excessive rainfall."  (Def.'s Mot. Summ. J. ¶¶ 18–19 (quoting Compl. ¶ 4).)  On March 6, 2011, the City of Philadelphia Licenses and Inspections issued a second Violation Notice to Plaintiffs, again designating the premises as "unsafe."  (Id. ¶ 22.)

4

### C.  **The Prior Loss in March 2010**

In March 2010, Plaintiffs' home sustained a water loss to the kitchen located in the rear of their home.[5]  (Id. ¶ 23.)  Plaintiffs were insured under a homeowners' policy of insurance issued by Liberty Mutual Insurance Company, and the claim was for "water from roof," which caused "Structure Damage" to the "kitchen one wall molding around door and ceiling."  (Id. ¶ 24–25.)  Liberty Mutual paid Plaintiffs $1,944.90 for the loss.  (Id. ¶ 27.)  Plaintiff Annette White testified at her deposition that "we ended up not fixing the water damage that was over the back door because we needed to fix – bring the door up.  So he ended up fixing the front porch." (White Dep. 93:9–11.)  The Liberty Mutual Policy was subsequently cancelled on June 23, 2010 for non-payment of the premium.  (Def.'s Mot. Summ. J. ¶ 28.)

### D.  **The Exterior Rear Wall**

Plaintiff Annette White testified at her deposition that the rear wall of the home was visible and not obstructed by plant growth or trees.  (White Dep. 146:6–147:5.)  She also testified that in the approximately thirty years prior to the wall collapse in March 2011, no maintenance or repairs were made to the rear wall other than repainting garage doors, repainting a steel I-beam that served as a header for the garage doors, and applying new tar to the roof, which was done approximately thirteen years ago.  (Def.'s Mot. Summ. J. ¶ 31 (quoting White Dep. 69:14–70:5; 72:14–19; 73:2–8; 74:14–17; 77:8–78:9; 139:1–140:4; 141:13–142:3).)  She testified further that missing mortar and spaces between bricks in the rear wall that collapsed, as well as a side wall that did not collapse, were visible.  (Id. ¶ 32 (quoting White Dep. 140:5–143:6; 143:1–6; 144:8–12).)

---

[5] Plaintiff Annette White confirmed in deposition testimony that in March 2010 there was a water loss at the rear of the home where the exterior wall collapsed in March 2011.  (Def.'s Mot. Summ. J. ¶ 26 (quoting Deposition of Annette White ("White Dep."), 92:4–93:17; 99:4–102:7, Jan. 8, 2013).)

### E.  Defendant's Engineering Report

On March 23, 2011, Mary K. McElroy, P.E., of Hudson International Consultants and

Engineers, issued her expert report concerning the cause of Plaintiffs' March 2011 loss.  (Def.'s

Mot. Summ. J. ¶ 34; Def.'s Mot. Summ. J., Ex. N.)  Ms. McElroy's report concluded that within

a reasonable degree of engineering certainty the loss was due to:

> (1) Long-term and on-going water infiltration via deteriorated
>     mortar joints, cracks in the brick work, roof leaks, and poorly
>     maintained roof drainage controls.
> (2) Repeated exposure to freeze-thaw cycles resulting in additional
>     cracking in the brick work and increased potential for further
>     water infiltration.
> (3) Formation of additional, large cracks in the brick work due to
>     the corrosion of the steel I-beam header and resultant physical
>     forces exerted on the brick work due to the expansion of that
>     material.
> (4) Overall poor maintenance of the steel header, brick work,
>     mortar joints and roof covering and drainage.

(Def.'s Mot. Summ. J., Ex. N at 5–6.)  Her report noted that "[t]he failure was progressive in

nature and did not result from the single storm event on March 6th [sic], 2011 but from long-term

and on-going infiltration resulting from deferred or poor maintenance to the elements of the

structure."  (Id.)

On June 12, 2011, Mr. Hargraves of Hargraves Home Improvements emailed Plaintiff

Annette White with an estimate for $25,000 to brace and reconstruct the collapsed rear wall, and

on June 24, 2011, emailed her again stating:

> Upon inspection of rear wall were [sic] collapse occurred, I
> observed the following conditions that I believed [sic] contributed
> to the deterioration and the collapse of the stone footing.
> {water inside wall coming from roof behind eaves box on main
> roof flowing down inside wall to stone foundation wall which
> washed out the aging mortar joints.}   I strongly recommend

bracing of remainder of wall to prevent further damage to said
property as well [as] adjoining property.

(Def.'s Mot. Summ. J. ¶ 35–37; Def.'s Mot. Summ. J., Ex. O.)

### F. **Defendant's Claims Handling and Denial**

On March 10, 2011, Defendant issued a Reservation of Rights letter to Plaintiffs,

notifying them of "a potential coverage problem," specifically referencing Exclusion 3.A for

"wear and tear, marring, scratching, aging, deterioration, corrosion, rust, mechanical breakdown,

latent defect, inherent vice, or any quality in property that causes it to damage or destroy

its[elf]." (Def.'s Mot. Summ. J. ¶ 43.) Defendant issued a supplemental Reservation of Rights

letter to Plaintiffs on April 5, 2011, additionally reserving rights under Exclusions 1.F. –H., 2A.

–C., and 3A. –C., and advising Plaintiffs that they had a duty to "protect the property from

further damage." (Id. ¶ 44.)

On May 2, 2011, Defendant denied coverage for Plaintiffs' claim, stating in the denial

letter that their claim is not a covered collapse. (Id. ¶¶ 45–46.) Defendant specifically denied

coverage due to a non-sudden and accidental collapse for the following reason:

> This policy language applies to this loss because our investigation
> revealed that **the collapse of the rear portion of the home was
> due to long-term water infiltration which was not hidden,
> sudden, or accidental**. The policy excludes collapse with the
> exception of the perils listed within Section I – Broad Named
> Perils or the perils listed above, and this loss does not meet the
> criteria within this additional coverage.

(Id. ¶ 46 (emphasis added).) Defendant provided Plaintiffs and their counsel with copies of the

denial letter and engineering report. (Id. ¶¶ 47–48.) During the investigation, Defendant

expended $17,212.94 in payments to provide Plaintiffs temporary housing from March 17, 2011

through May 2, 2011. (Id. ¶ 49.)

### G.  Subsequent August 2011 Claim, Investigation, and Denial

On or about August 28, 2011, Plaintiffs notified Defendant of alleged damage to the same rear wall of their home as the March 2011 loss.  (Def.'s Mot. Summ. J. ¶ 50.)  The August 2011 damage was a rear wall collapse which caused damage to the dining room, kitchen, and two bedrooms.  (Id. ¶ 51.)  That same day, Defendant acknowledged the claim and assigned it a claim number.  (Id. ¶ 52.)  On August 29, 2011, Defendant issued a Reservation of Rights to Plaintiffs to inform them of a potential coverage problem, which Defendant identified as a "similar loss within prior six months."  (Id. ¶ 53.)  On August 31, 2011, Defendant issued a supplemental Reservation of Rights to Plaintiffs, additionally reserving rights under the Policy pursuant to Exclusion 1.H. and Condition 2.B.  (Id. ¶ 54.)  Ms. McElroy performed another investigation at Plaintiffs' home and supplemented her original report at Defendant's request, concluding that:

> Based on my inspection findings, I state within a reasonable degree of engineering certainty that further damage to the brick masonry wall resulted from typical, on-going failure of that wall.  I did not observe any temporary support to the wall during either the March, 2011 inspection or during this recent inspection.[6]  Temporary support may have stabilized the wall and prevented the continued failure of the masonry structure.   Without constructing any temporary or permanent structural support, the masonry wall was unrestrained; the loss of additional brick work, windows, doors and interior walls would have occurred regardless of weather events.  As such, the continued deterioration and failure of the wall did not result from the storm events on August 27th, 2011.

---

[6] Defendant asserts that it requested documents or other evidence from Plaintiffs to show that Plaintiffs provided temporary support or took any steps to prevent further collapse of the wall beyond allowing a tarpaulin to be temporarily placed over the wall, but such documents or evidence have not been produced in discovery despite Defendant's request for them to be so produced.  (Def.'s Mot. Summ. J. ¶¶ 57–58.)  Plaintiff Annette White testified at her deposition that someone named E.J. performed stabilization work at their home at a cost of "a couple thousand dollars" six or seven months prior to her deposition in January 2013.  (White Dep. 22:15–24:5.)

(<u>Id.</u> ¶¶ 55–56.)  Ms. McElroy's supplemental report was provided to Plaintiffs.  (<u>Id.</u> ¶ 60.)

On November 14, 2011, Defendant denied coverage to Plaintiffs related to their August 28, 2011 claim based on a determination that it "is a continuation of the prior loss filed [in March 2011] which has been denied."  (<u>Id.</u> ¶ 59.)

## H.  **Plaintiffs' Engineering Report**

Plaintiffs also submitted an engineering report, completed by John J. Hare, R.A., P.E., P.P.  (Pl.'s Mem. Supp. Resp. Opp'n Summ. J. 1.)[7]  Mr. Hare reviewed and photographed Plaintiffs' residence on November 26, 2011 (Pl.'s Resp. Opp'n Summ. J., Ex. A), subsequent to both the March 2011 loss and the August 2011 loss.  In his report, Mr. Hare concluded within a reasonable degree of engineering certainty that:

- It is because of this historical type of construction (salmon brick that, because of early firing methods used in this countries [sic] in the 17th and 20th century, did not develop the full high compressive strength of the hard-fired bricks used as face brick") that the wall collapsed.
- This collapse has absolutely nothing to do with maintenance. In fact, it is not even possible to observe or detect the problem.
- When a brick wall such as this collapses, it collapses suddenly, catastrophically, and completely without warning.
- These catastrophic collapses develop for two reasons: One, the salmon bricks are not uniform in strength.  Back when these bricks were made, there was no way to test and determine the strength of the brick.  The salmon brick could vary between partially fired and somewhat hard, to completely un-fired and soft with the potential for falling apart.  Second, it is the salmon brick, the inside wythe, that is actually used for bearing to support the floor joists.
- The existing corner at the intersection of the rear wall and the light well bearing wall is also a major contributor of the structural demise of this bearing wall.  The corner between the two walls, with a door and two windows within the corner,

---

[7] Plaintiffs did not number the pages of their Response in Opposition to Defendant's Motion for Summary Judgment, nor did they number their Memorandum of Law in support thereof.  The Court has numbered the pages for them.

created a basic structural anomaly, a weakness between the two
walls.

- The proximate and actual case [sic] of the collapse at the White
residence was the sudden and complete crushing of the salmon
bricks supporting the floor joists and wood beam as the
kitchen, which pushed the wall outward and brought it down.

(Id. at 1–2 (quoting Pl.'s Resp. Opp'n Summ. J., Ex. A).)

## I.  **Procedural History**

Plaintiff Annette White filed a three-count complaint in Pennsylvania state court on
February 28, 2012.[8]  Defendant removed this matter to federal court on January 25, 2013, and on
July 13, 2013, this Court bifurcated the coverage aspects from the bad faith claim.  (Def.'s Mot.
Summ. J. ¶¶ 8–9.)  Pursuant to this Court's directive, Defendant filed its Answer with
Affirmative Defense and Counterclaim for Declaratory Judgment, previously filed in state court,
on July 31, 2013.  (Id. ¶ 10.)  Defendant filed a Request for Default Judgment as to MetLife's
Affirmative Defenses and Counterclaim for Declaratory Judgment on August 23, 2013, and
Plaintiffs filed their response in opposition on August 29, 2013.  Defendant filed its Motion for
Summary Judgment on November 25, 2013.  Plaintiffs filed their Response in Opposition on
December 23, 2013.  Defendant filed a Reply Brief in Support of Motion for Summary Judgment
on January 3, 2014, and filed a Second Reply Brief in Support of Motion for Summary Judgment
on March 14, 2014.  As the briefing process has been thoroughly exhausted, Defendant's Motion
for Summary Judgment is now ripe for judicial consideration.

---

[8] Annette White sued Defendant in the Court of Common Pleas of Philadelphia County regarding
coverage under Plaintiffs' homeowner casualty insurance policy with Defendant.  (Compl. ¶¶ 1–
13.)  Plaintiff Charles Williams was later added as a plaintiff by stipulation filed in state court on
October 16, 2012.  (Def.'s Mot. Summ. J., Ex. B)  The third count of the complaint for common
law fraud was dismissed with prejudice after the Court of Common Pleas granted Defendant's
Motion for Partial Judgment on the Pleadings.  (Def.'s Mot. Summ. J., Ex. C.)

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial,"

summary judgment is appropriate.  <u>Celotex</u>, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  <u>Anderson</u>, 477 U.S. at 249–50.

## III.    DISCUSSION

Defendant moves for summary judgment on Plaintiffs' claims for breach of contract and statutory bad faith, as well as for summary judgment on its counterclaim for a declaratory judgment.  Defendant argues that Plaintiffs are not entitled to coverage under the Policy because (1) collapse and loss caused by weather are not covered under the Policy; (2) the collapse was not caused by a single rain event but rather by long-term, ongoing water infiltration behind the rear wall, a conclusion supported both by an engineer Defendant retained and by an estimate of repair that an independent contractor prepared for Plaintiffs; and (3) even without assessing exclusions of the Policy, Plaintiffs cannot overcome their burden of proving the loss was "sudden and accidental," as required by the Policy.  (Def.'s Mem. Supp. Mot. Summ. J. 2.) Defendant also argues that Plaintiffs cannot establish by clear and convincing evidence that Defendant acted in bad faith, because (1) record evidence demonstrates that Plaintiffs are not entitled to coverage; (2) Defendant adjusted Plaintiffs' claim in a timely manner, afforded them over $17,000.00 in temporary housing, corresponded with Plaintiffs regularly, and based the coverage denial on an engineering analysis.  (<u>Id.</u>)  Plaintiffs respond that the collapse was sudden and accidental and caused by hidden decay and is therefore covered by the Policy, relying on the engineering report of Mr. Hare.  (Pl.'s Mem. Supp. Resp. Opp'n Summ. J. 1, 5.)  The Court will first address the breach of contract claim, followed by the bad faith claim, and finally consider Defendant's counterclaim for a declaratory judgment.

A.      **Breach of Contract**

Plaintiffs allege that despite repeated demands for payment from Defendant, "Defendant has continually refused to pay damages associated with [Plaintiffs'] damage claims and, furthermore, has concluded that all damages to [Plaintiffs'] property are not covered losses." (Compl. ¶ 15–16.)  Specifically, Plaintiffs assert that "Defendant accepted valid policy premiums from Plaintiff so that coverage may be afforded in the event [of the type of damage sustained at Plaintiffs' residence and] has failed to fulfill his contractual obligations associated with the payment of said claim."  (Id. ¶ 17.)  Defendant argues that Plaintiffs' breach of contract claim fails because there is no coverage under the Policy for the subject loss.  (Def.'s Mem. Supp. Mot. Summ. J. 2.)

Under Pennsylvania law, which governs interpretation of the present Insurance Policy,[2] several well-established principles control.  J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 363 (3d Cir. 2004).  "As a threshold matter, '[t]he task of interpreting a contract is generally performed by a court, rather than by a jury.  The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.'"  Id. (quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (citations omitted)).  Where an insurance policy provision is ambiguous – such as where the questionable language is "reasonably susceptible of different constructions and capable of being understood in more than one sense" –  it is to "be construed against the insurer and in favor of the insured. . . . "

---

[2]   Under Pennsylvania law, an insurance contract is governed by the law of the state in which it was created.  See Hamm v. Allstate Prop. & Cas. Ins. Co., 908 F. Supp. 2d 656, 665 (W.D. Pa. 2012) (citing Meyer v. CUNA Mut. Ins. Soc., 648 F.3d 154, 162 (3d Cir. 2011)).  Accordingly, Pennsylvania law governs this dispute because the Plaintiffs are Pennsylvania residents, the Policy was delivered in Pennsylvania to provide coverage for a Pennsylvania residence, and the loss occurred in Pennsylvania.  See Hamm, 908 F. Supp. 2d at 665.

Id. (internal quotations omitted).  Where the insurance policy language is clear and unambiguous, however, the court must enforce that language.  Id. (citing Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (further citations omitted).  Stated differently, "a court must refrain from torturing the language of a policy to create ambiguities where none exist," McMillan v. State Mut. Life Assur. Co. of Am., 922 F.2d 1073, 1075 (3d Cir. 1990), and should, wherever possible, "interpret the policy so as to avoid ambiguities and give effect to all of its provisions."  Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987).  "'Where the policy contains definitions for the words contained therein, the court will apply those definitions in interpreting the policy.'"  J.C. Penney, 393 F.3d at 363 (quoting Monti v. Rockwood Ins. Co., 450 A.2d 24, 25 (Pa. 1982) (further citations omitted)).  Policy exclusions are strictly construed against the insurer, Selko v. Home Ins. Co., 139 F.3d 146, 152 n.3 (3d Cir. 1998) (further citations omitted), and if it is shown that an exclusion applies, the insured then bears the burden of proving that an exception to the exclusion applies and that the damages claimed are covered, the exclusion notwithstanding.  See TIG Specialty Ins. Co. v. Koken, 855 A.2d 900, 915 (Pa. Commw. Ct. 2004).  Ultimately, the court may not "rewrite the insurance contract, under the guise of judicial interpretation, to expand the coverage beyond that as provided in the policy." Occidental Fire & Cas. Co. of N. Carolina v. Reber Corp., No. Civ.A.04-876, 2004 WL 1529176, at *3 (E.D. Pa. June 28, 2004) (citing Guardian Life Ins. Co. v. Zerance, 479 A.2d 949, 953 (Pa. 1984)).

In the present case, Defendant denied insurance coverage for Plaintiffs' March 2011 loss and the subsequent August 2011 loss because Plaintiffs have not set forth any record facts to establish that the wall collapse was "sudden and accidental," and because Defendant determined that the collapse was caused by long-term, ongoing water infiltration behind the wall.

Defendant points out that Plaintiffs alleged in pleadings and attested in discovery that the collapse was caused by "excessive rainfall," which Defendant contends is an uncovered loss caused by water.  Defendant next argues that Plaintiffs did not show that an exception to the Policy exclusion applied such that coverage should be afforded, because they did not demonstrate that the collapse was caused by hidden decay of the structure, and that the evidence Defendant put forward demonstrates that the decay was not hidden "but rather evident through cracked mortar and bricks as well as a severely rusted steel I-beam and rotten wood."  (Def.'s Second Reply Br. Supp. Mot. Summ. J. 4.)  According to Defendant, coverage is therefore precluded because the Policy "specifically and unambiguously excludes coverage for 'wear and tear, marring, scratching, aging, deterioration, corrosion [or] rust' as well as 'settling, cracking, shrinking, bulging or expansion of . . . foundations, footings, supports, walls, floors, roofs or ceilings.'"  (Id. (quoting the Policy at 22–24).)  Defendant argues further that the evidence Plaintiffs provided in opposition to Defendant's Motion for Summary Judgment, the expert report of John Hare, P.E., contains conclusions finding that faulty construction methods, practices and materials were the cause of the collapse, which Defendant argues places the collapse within the Construction Defects Exclusion in the Policy.  The Court will examine each of the relevant Policy provisions.

### 1.   The Weather Conditions Exclusion

The Policy covers losses to Plaintiffs' home as follows:

CAUSES OF PROPERTY LOSS
SECTION I – LOSSES WE COVER
(SPECIAL PERILS)
\*        \*        \*
COVERAGE A – DWELLING AND COVERAGE B – PRIVATE
STRUCTURES

> We will pay for sudden and accidental direct physical loss or
> damage to the property described in Coverages A and B, except as
> excluded in SECTION I – LOSSES WE DO NOT COVER.

(Def.'s Mot. Summ. J. ¶ 15.)

Plaintiffs first claimed that the rear wall of their home collapsed due to excessive rainfall.

As described above, The Policy includes the following relevant exclusions:

### SECTION I – LOSSES WE DO NOT COVER

1.  We do not insure under any Section I coverage for any loss which would
    not have happened in the absence of one or more of the following
    excluded events.
    > (a) the cause of the excluded event;
    >
    > (b) other causes of the loss; or
    >
    > (c) whether such causes acted at the same time or in any other
    > sequence with the excluded event to produce or contribute to the
    > loss.
    >
    > These exclusions apply whether or not the excluded event results
    > in widespread damage or affects a substantial area.  The **excluded
    > events** are listed below.
    >
    > \*          \*          \*
    >
    > K.        **Collapse**, except as granted under SECTION I –
    > ADDITIONAL COVERAGES for Collapse.

2.        We do not insure under any coverage for any loss consisting of one
   or more of the items below . . . .   Further, we do not insure for loss
   described in Exclusion 1. Above [including 1.K – Collapse] and Exclusion
   3, below.
   > \*          \*          \*
   >
   > C.        **weather conditions**.
   >
   > However, this exclusion only **applies if weather
   > conditions contribute in any way with an excluded event
   > or cause of loss to produce the loss**.

(Def.'s Mot. Summ. J. ¶ 16 (emphasis added).)

Put more simply, the relevant provisions of the Policy dealing with the "weather

conditions exclusion" state that sudden and accidental direct physical loss or damage to the

property is not covered in the event of collapse where weather conditions contributed in any way

with a collapse, which is an excluded event.  There is no ambiguity in the Policy regarding a

collapse being excluded from coverage where the collapse was caused, or caused in part, by

weather conditions.  Accordingly if the collapse had been caused by excessive rainfall as

Plaintiffs originally claimed, it would not have been covered under the language of the Policy

and Defendant did not breach its contract with Plaintiffs by denying coverage for the March

2011 loss on that basis.  See Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563,

566 (Pa. 1983 (citing Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (further

citations omitted)).

### 2.  The Construction Defects Exclusion

Plaintiffs subsequently argued, relying on an expert report by Mr. Hare, that the collapse

of the rear wall of their home occurred because of the historical construction practice of using

salmon bricks, which are weak and can lead to collapse.  As previously described, the Plaintiffs'

home was covered by the Policy in the event of loss, subject to certain exclusions.  The relevant

provisions of the Policy dealing with the "construction defects exclusion" state:

SECTION I – LOSSES WE DO NOT COVER
1.  **We do not insure under any Section I coverage for any loss which would not have happened in the absence of one or more of the following excluded events**.
    (a) the cause of the excluded event;
    (b) other causes of the loss; or
    (c) whether such causes acted at the same time or in any other sequence with the excluded event to produce or contribute to the loss.
    These exclusions apply whether or not the excluded event results in widespread damage or affects a substantial area.  The **excluded events** are listed below.
*      *      *

    K.    **Collapse**, except as granted under SECTION I – ADDITIONAL COVERAGES for Collapse.
2.    **We do not insure under any coverage for any loss consisting of one or more of the items below** . . . .  Further, we do not insure for loss described in Exclusion 1. Above [**including 1.K – Collapse**] and Exclusion 3, below.
*      *      *

    B.    defective, inadequate, faulty or unsound:

> 1.      planning, zoning, development, surveying; siting;
> 2.      **design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;**
> 3.      materials used in repair, construction, renovation or remodeling; or
> 4.      maintenance;
> of any property whether on or off the residence premises. Property included land, structures or improvements of any kind; and

(Def.'s Mot. Summ. J. ¶ 16 (emphasis added).)

In other words, physical damage to the property is not covered by the Policy in the event of a collapse where defective, faulty, or unsound design, specifications, workmanship, or construction contributed to the collapse.  There is no ambiguity in the Policy regarding a collapse being excluded from coverage where the collapse was caused, or caused in part, by defective, faulty, or unsound design, specifications, workmanship, or construction, in this case the use of salmon bricks in the construction of Plaintiffs' home.  Plaintiffs' engineering report from Mr. Hare concludes that the rear wall collapsed due to the inclusion of salmon bricks in construction and that a structural anomaly created by the placement of the door and two windows in the corner intersection of the rear wall and the light well bearing wall contributed to the "structural demise" of the wall.  (Pl.'s Resp. Opp'n Summ. J., Ex. A.)  However, under the Policy exclusions, a collapse which occurs due to faulty or defective construction or design is not covered.  Therefore Defendant did not breach its contract with Plaintiffs by denying coverage for the March 2011 loss based on the construction defects exclusion.  See Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (citing Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (further citations omitted)).

### 3.   The Deterioration Exclusion and the Hidden Decay Exception

The Policy does provide for coverage in the event of a collapse, but only as follows:

SECTION I – ADDITIONAL COVERAGES
*       *       *

16.     Collapse.   We will pay for sudden and accidental direct physical loss to covered property involving the entire collapse of a building or any part of a building **caused only by one or more of the following**:

*       *       *

A.      perils described in Section I – Broad Named Perils;
B.      **hidden decay of the structure**;
C.      hidden insect or hidden vermin damage;
D.      weight of contents, equipment, animals, or people;
E.      weight of ice, snow, sleet or rain which collects on a roof; or
F.      **use of defective material or methods in construction**, remodeling or renovation **if the collapse occurs during the course of the construction, remodeling or renovation**.

(Def.'s Mot. Summ. J. ¶ 17 (emphasis added).)

Defendants assert that the collapse was caused by decay and deterioration which was not hidden, and denied coverage on that basis.  Specifically, Defendant relied on Ms. McElroy's report which concluded that within a reasonable degree of engineering certainty the loss was due to water infiltration via visibly deteriorated mortar joints, brick work cracks, roof leaks, and poorly maintained roof drainage controls, a problem which was exacerbated by freeze-thaw cycles, corrosion in a steel I-beam header, and overall poor maintenance of the header, brick work, mortar joints, and the roof.  (Def.'s Mot. Summ. J., Ex. N at 5–6.)[9]  As the decay was not hidden, the loss resulting from the collapse is not covered under the hidden decay exception to the collapse exclusions under the Policy.  While Plaintiffs' expert opined that defective materials and construction methods contributed to the collapse of the rear wall of Plaintiffs' home, the

---

[9] Defendant also introduced photographs which show the cracks and deterioration described in Ms. McElroy's report, as well as Plaintiffs' deposition testimony, discussed above, describing the visible cracks and corroded I-bream header.  (See Def.'s Mot. Summ. J., Ex. G; Def.'s Mot. Summ. J., Ex. K, White Dep.; Def.'s Mot. Summ. J., Ex. N, McElroy Report and Photographs.)

collapse did not occur during the course of construction, remodeling, or renovation and is therefore not covered under Exception F within Section I.16. of the Policy regarding coverage for a collapse.  See Standard Venetian Blind Co., 469 A.2d at 566 (citing Med. Protective Co., 198 F.3d at 103 (further citations omitted)).

In sum, the Court finds that no genuine issue of material fact exists as to Plaintiffs' breach of contract claim.  The Policy unambiguously stated that a collapse caused by weather conditions or construction defects, the two explanations Plaintiffs advanced, was excluded from coverage.  Plaintiffs do not point to evidence to directly rebut Defendant's explanation, supported by Defendant's expert report, that the collapse was caused by non-hidden deterioration and decay which is also excluded from coverage.  Moreover, Plaintiffs do not offer evidence to show that the collapse of the rear wall of their home occurred because of conditions that are included, rather than excluded, from coverage.  Accordingly, the Court grants Defendant's Motion for Summary Judgment on the breach of contract claim.

**B.**   **Bad Faith**

Count Two of Plaintiffs' Complaint alleges that Defendant wrongfully and in bad faith withheld payment under the Policy from Plaintiffs without a reasonable basis "as there is no legitimate and reasonable basis by which to deny the clear and convincing harm evidenced on Plaintiff's property."  (Compl. ¶ 24.)  Plaintiffs' expert, Mr. Hare, stated that "[i]t has to be noted that after the collapse, the building interior has rapidly deteriorated due to moisture intrusion, although the evidence shows that the Whites had taken care of the house with numerous improvements up until the time of collapse," and that "[f]or any insurance adjuster to attempt to claim that the Whites contributed to this collapse in any way and, in my professional opinion, is

indicative of bad faith on the part of the insurance company, and not indicated by the evidence." (Pl.'s Resp. Opp'n Summ. J. 6–7.)

To establish a claim of bad faith under 42 Pa. C.S. § 8371, a plaintiff must establish that the insurer (1) lacked a reasonable basis for denying benefits and (2) knew or recklessly disregarded its lack of a reasonable basis. Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997); Toy v. Metro. Life Ins. Co., 928 A.2d 186, 193 (Pa. 2007).  In the insurance context, bad faith denotes a "frivolous or unfounded" refusal to pay policy proceeds, which imports a dishonest purpose and a breach of a known duty, such as good faith and fair dealing. Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994) (quotations omitted).  While mere negligence or bad judgment are insufficient, a showing of reckless disregard will suffice to establish bad faith. 3039 B Street Assoc., Inc. v. Lexington Ins. Co., 740 F. Supp. 2d 671, 677 (E.D. Pa. 2010).  "[I]n order to defeat a motion for summary judgment, a plaintiff must show that a jury could find by 'the stringent level of clear and convincing evidence,' that the insurer lacked a reasonable basis for its handling of the claim and that it recklessly disregarded its unreasonableness." Id. at 678 (quotations omitted).

The current bad faith claim before the Court cannot get past the initial element—lack of a reasonable basis for denying benefits.  As explained in detail above, Defendant's denial of benefits was not only reasonable, but correct under the Policy language.  Absent a showing of an unreasonable denial, Plaintiffs are not entitled to recover on their bad faith claim.  Thus, the Court enters summary judgment in favor of Defendant on Count Two of the Complaint.

## IV.    DEFENDANT'S REQUEST FOR DECLARATORY JUDGMENT

Defendant also requests a judgment in its favor declaring that: (1) no coverage for the subject loss is owed by Defendant to Plaintiffs under the terms and conditions of the policy; (2)

Defendant is not in breach of contract, and has not acted in bad faith; and (3) Plaintiffs' claim for bad faith as set forth in Count Two of Plaintiffs' Complaint fails as a matter of law and is dismissed.  The Court is granting Defendant's Motion for Summary Judgment with respect to Plaintiffs' breach of contract and bad faith claims, and accordingly Defendant's counterclaim for a declaratory judgment in its favor on the above three grounds is denied as moot.

## V.      CONCLUSION

In light of the foregoing, the Court finds no basis on which Plaintiff may sustain any of the stated causes of action against Defendant.  Accordingly, Defendant's Motion for Summary Judgment is granted, and judgment on the entirety of Plaintiff's Complaint is entered in favor of Defendant.  Defendant's Motion for Summary Judgment on its counterclaim for a declaratory judgment is denied.  An appropriate Order follows.